# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

_____

BELGRAVIA HARTFORD GOLD ASSETS

CORP., F/K/A INTERCONTINENTAL

POTASH CORP,

      Plaintiff,

  v.                           Civil Action

POLYNATURA CORP., F/K/A           No. 2:21-cv-

INTERCONTINENTAL POTASH CORP.     00918-MIS-

(USA),                          JHR

      Defendant.

_____

VIDEOTAPED DEPOSITION OF

PAUL HONG

DATE:          Thursday, February 15, 2024

TIME:          10:01 a.m.

LOCATION:      Chaffetz Lindsey LLP

               1700 Broadway, 33rd Floor

               New York, NY 10019

REPORTED BY:   Richelle Modestil

JOB NO.:       6472569

PAGES 148-185 ARE CONFIDENTIAL

Page 1

P. HONG

A   Yes.

Q   Okay.  I am handing you --

MR. EDELMAN:  Here you go -- what number are we on?

THE REPORTER:  42.

MR. EDELMAN:  42.

BY MR. EDELMAN:

Q   What we'll mark as Exhibit 42 which I'm representing to you is a true and accurate copy of Exhibit 6 to your Declaration which is why the first page says Exhibit 6.  Which is a copy of the Royalty Agreement.  Take a look, be sure you agree with that statement.

(Exhibit 42 was marked for identification.)

A   That it's -- a good and accurate copy or --

Q   Yes, of the Royalty Agreement.  Or even that it's of Exhibit 6 to your Declaration?

A   Oh, I will take your word for it.  I assume that it is.  I can't imagine why not.

Page 102

P. HONG

Q   And what I want you to do is at the page at the bottom -- the page number at the bottom -- you'll see different page numbers at the top is turn to -- apologies.  Start on page 1, paragraph D, do you see where it refers to the water lease and defines that term?  I see you leafing through, I'm not referring to a separate definition.  I'm just saying that it --

MR. LITVACK:  Yeah, I was going to say -- there is no definition, yeah.

BY MR. EDELMAN:

Q   It just talks about the -- that certain first amendment effective February 14, 2015, as amended and then water lease in bold there.  Do you see that?

A   I see D, yes.

Q   Okay.  And turn to page 6 --

MR. LITVACK:  Six at the bottom?

MR. EDELMAN:  Six at the bottom.

THE WITNESS:  Okay.

//

Page 103

P. HONG

BY MR. EDELMAN:

Q   And you see this paragraph 5, talks about development and operations; correct?  At least that's the heading --

MR. LITVACK:  That's the heading.

BY MR. EDELMAN:

Q   That's the heading and then the paragraphs that follow talk about development and operations.  And what I want you to take a look at is actually on the next page, on page 7, paragraph E and tell me once you -- read paragraph E and tell once you've read that.

A   Okay.

Q   The last sentence talks about grantee, who is PolyNatura's obligation to confer and consult with grantor regarding the renewal of the water lease; correct?

A   I don't think so.  The grantee is Belgravia.

Q   So you think that's a typo?

A   I think that -- I think it's confused but recall that until and certainly as of the date of this

Page 104

P. HONG

agreement, Belgravia controlled PolyNatura and had the institutional knowledge, institutional recollection, had many of the files and similar of PolyNatura ICP USA.

And most importantly regarding the water.  That it was really contacts of Belgravia that had good insight into obtaining, maintaining leases.  So I think that this means what it says which is that the grantee, Belgravia, agrees to confer and consult with PolyNatura regarding renewal of the water lease.  It doesn't require that they produce any results.  But it -- and we did ask that grantee be available to help grantor, PolyNatura, renew its water lease.

Q   Okay.  The sentence before that says grantor meaning ICP USA, PolyNatura, "shall undertake commercial best efforts to renew mining leases and the water lease for the term necessary to complete all royalty payments under this Royalty Agreement."  So under that -- does that

Page 105

27 (Pages 102 - 105)

P. HONG

sentence mean what it says?
A   I think so.
MR. LITVACK:  Hold on --
THE WITNESS:  I mean -- does it mean what it says?  It's hard to see what else it could mean other than what it says.
BY MR. EDELMAN:
Q   Okay.  But the next sentence you think that despite that previous sentence, that you think that it is grantee, Belgravia's obligation to obtain a renewal of the water lease at least six months prior to the expiration of the same?
MR. LITVACK:  That's exactly what it says.
THE WITNESS:  Also, I didn't even say that, so I'm confused why you're saying I said that.
BY MR. EDELMAN:
Q   You said this sentence means what it says.  I asked you if there's a typo.
A   I'm not sure what the this is.
Q   Let's parse through this.

Page 106

P. HONG

Let's --
A   Figure out which one the this is, there are two of them.
Q   Let's take time to understand this.  This paragraph reads grantee --
MR. LITVACK:  You want to stop?  Who is the grantee?
MR. EDELMAN:  Grantee as defined on paragraph 1 -- or not even paragraph 1, the very start of the Royalty Agreement is defined as Intercontinental Potash Corp., a Canadian corporation.  So that's Belgravia.
MR. LITVACK:  Okay.  Okay.  So grantee is Belgravia.  Got you.  Okay.
MR. EDELMAN:  Grantee is Belgravia.
BY MR. EDELMAN:
Q   "Acknowledges and understands that the term of the water lease is currently scheduled to end on October 15, 2019, unless extended by the leaser"; right?
MR. LITVACK:  M-hm.
//

Page 107

P. HONG

BY MR. EDELMAN:
Q   Mr. Hong, is that right?
A   That what it says --
MR. LITVACK:  He's reading it correctly, yes.
THE WITNESS:  I mean -- yeah, I agree you're reading it correctly.
BY MR. EDELMAN:
Q   And again, just to tie back to the previous testimony, that October 5, 2019, date is what was underlined in Mr. Sims' email to amongst others Graham Wheelock; right?
A   I think I still have it here.
Q   Page 3 of Exhibit 40.
A   Yes, it's the same --
Q   That's the same date.  All right.  And the next sentence provides grantor, meaning PolyNatura, "shall undertake commercial best efforts to renew mining leases and the water lease for the term necessary to complete all royalty payments under this Royalty Agreement"; right?

Page 108

P. HONG

A   Yes, that's what it says.
Q   So it's PolyNatura's obligation to undertake commercial best efforts?
A   To renew the leases, et cetera.  Yes.
Q   And that's consistent with the rest of this paragraph 5.  It's grantor, it's PolyNatura who has the obligation -- I mean they're in control of the asset at this point; right?
MR. LITVACK:  No, you can't do this.  I know what you're trying to do.  This is totally improper.  What is it you want to ask him?  The sentence says what he says it says.  You've read it.  What's next?
MR. EDELMAN:  Mr. Litvack, respectfully, I want to understand why this language is the way it is, and I want to understand what Mr. Hong's understanding of this language is.
MR. LITVACK:  Okay.  Now, you got two questions there.  The first one is you want to know how this language came to be.  If that's what you want to know, ask him,

Page 109

28 (Pages 106 - 109)

P. HONG

and if he knows, he'll tell you. And the second question is, is what his understanding is. Do I understand what you want? If so, just ask those questions.

MR. EDELMAN: Let's get there a little bit differently.

BY MR. EDELMAN:

Q Mr. Hong, what is your understanding of who or which entity had control of the -- let's talk about the water assets after the Settlement Agreement became finalized?

MR. LITVACK: Okay. I object to the question. He can answer.

THE WITNESS: Who had control of the water assets? I mean, really? That's State of New Mexico had control over the water assets.

BY MR. EDELMAN:

Q And they had leased those to PolyNatura; correct? There was a lease to PolyNatura; correct?

A There was a lease with many

Page 110

---

P. HONG

conditions and similar to PolyNatura, but ultimately control is State of New Mexico.

Q Okay. Let's go back to the previous page, page 5. I'm sorry, page 6, paragraph 5.

A Okay.

Q This provides grantor PolyNatura, "shall use commercially reasonable efforts to realize revenues from the water lease and the mining leases." Correct?

MR. LITVACK: That's part of the sentence.

MR. EDELMAN: Correct.

THE WITNESS: Yes, that's -- the same as what I see.

BY MR. EDELMAN:

Q Were you involved in the drafting of this Royalty Agreement?

A Yes.

Q Okay. What is your understanding of the intent of this sentence? That partial sentence?

A I mean, you can't really

Page 111

---

P. HONG

describe the intent of a sentence without reading the entire document. I don't --

Q Okay. Did you think that Belgravia should have input into the mining leases? Monetization of the mining leases?

MR. LITVACK: I object to the form of the question.

A Did I think it should in terms of being --

Q Let me rephrase that --

MR. LITVACK: Let him finish his answer first. Let him finish his answer, you've asked a question.

MR. EDELMAN: Well, you've objected, I acknowledged your objection. Let me correct my question. I appreciate that.

BY MR. EDELMAN:

Q What was -- was it your intent as a party to this agreement, to drafting this agreement, that Belgravia would be able to control monetization of the water assets?

MR. LITVACK: Now, I'm going to

Page 112

---

P. HONG

object.

And you can answer if you can.

THE WITNESS: Do you need to formally file an objection or --

MR. LITVACK: Pardon?

THE WITNESS: Is that an objection in and of itself? Or --

MR. LITVACK: You go ahead.

THE WITNESS: Yes. No, Belgravia was not supposed to control monetization of the asset. Belgravia was supposed to share in any revenues that came out from monetization.

BY MR. EDELMAN:

Q That's right. PolyNatura wanted to -- I mean, wanted to control these assets moving forward; right?

A No, I didn't say that. So --

Q Okay. It didn't want to? Is that your testimony? Well, I just want --

MR. LITVACK: Come on.

BY MR. EDELMAN:

Q I'm really not trying to cause a problem here. What I'm trying to get at

Page 113

29 (Pages 110 - 113)

P. HONG

is the entire -- and tell me -- if I'm way off base, just tell me.  But I'm just trying to establish a fundamental idea here that I think everybody agrees on, that after the execution of the Royalty Agreement, after these two lawsuits were settled and the asset, specifically ICP USA, PolyNatura, became wholly owned by Cartesian or Cartesian affiliates, Cartesian wanted to PolyNatura and not Belgravia to handle the marketing of the mine including the water assets?

A   Yes, so your additional language is helpful, that's the reason why I was asking because the important thing is after Belgravia received cash and withdrew from ownership of the company, yes.  It made sense for the company to control its own destiny.  And not be controlled or not have its actions controlled by Belgravia.

Q   There was an -- we can, we'll go through this in a little while, and in fact, you can look at the next page.  Belgravia had certain inspection rights,

Page 114

P. HONG

but the decisions were as to how to monetize the assets were exclusively PolyNatura's?

A   Sorry, say that again?

Q   The decisions regarding the monetization of the assets were exclusively PolyNatura's?

A   Yeah, I think there's actually something in here about that.  Let's see.  "Grantor shall have no obligation to develop, quarry, mine, remove, or sell any applicable minerals or water.  And even if such activities have begun, nothing herein shall require grantor to continue to develop, quarry, mine, remove, or sell the same if in grantor's reasonable discretion, it is not commercially reasonable to do so."  That is not -- section that I was thinking.

"All marketing and sales decisions regarding water and applicable minerals shall rest exclusively with PolyNatura.  And PolyNatura may sell and the deliver water and applicable minerals

Page 115

P. HONG

to customers for any amount.  And under any terms which it determines in its discretion."  So I think that's the answer to your question.

Q   Yes, thank you so much.  And again, I apologize for a little detour.  What I'm trying to get at is with that language that all marketing and sales decisions shall rest exclusively with PolyNatura, why is it -- or would it even be possible under this agreement -- and now I'm looking at paragraph E, for Belgravia, it says if grantee, Belgravia, has not obtained a renewal of the water lease at least six months prior to the expiration of the same.

MR. LITVACK:  What's your question?  That's what it says.  Belgravia -- if Belgravia hasn't done -- hasn't obtained a renewal, it will confer with PolyNatura.  What's your question?

BY MR. EDELMAN:

Q   My question is, with the understanding that's in paragraph D, how

Page 116

P. HONG

was Belgravia in any position to obtain a renewal of the water lease?

MR. LITVACK:  Okay.  I object to it.  If you think you can answer, you can answer it.

THE WITNESS:  I think -- I think I said this before.  Belgravia is in a position to help with the water lease.  I mean, they had the contacts, it was the people at Belgravia who really have connections with, I understand or believe, the state, locally, et cetera.

I'm not responsible for drafting and signing of an agreement that created a time condition that didn't make sense.  But the important part of the sentence is grantee meaning Belgravia agrees to confer and consult -- does not require an outcome, but it does require that Belgravia actually confer and consult with PolyNatura regarding renewal of the water lease.  And that was really important.

BY MR. EDELMAN:

Q   And that's despite the fact that

Page 117

30 (Pages 114 - 117)

P. HONG

the previous sentence says PolyNatura shall undertake -- PolyNatura shall undertake commercial best efforts to renew mining leases and the water lease?

A   That's absolutely consistent. It's funny that you think it's not consistent.

Q   Why is that funny?

A   It's funny because of what I just said which is Belgravia did not have the opportunity -- obligation to deliver a result. But it did have to confer and consult to help achieve that result. And then PolyNatura is the one who said that it would use efforts to renew. Those are consistent with each other.

Q   So during this period that PolyNatura shall be undertaking commercial best efforts to renew the water lease, it is actually Belgravia who should be doing it?

MR. LITVACK:  You are at this point, just arguing with the witness. He's answered you at least three times. He

Page 118

P. HONG

told you what he believes Belgravia should be doing and why they should be doing it. You may not agree, but that's his testimony.

THE WITNESS:  Okay.  I'm puzzled how you can't see that those two things work together.

BY MR. EDELMAN:

Q   Is it your testimony that Belgravia should have been interacting with the State Land Office to renew the water lease after the signing of this Royalty Agreement?

A   No, if I said that, I'm sorry. But I don't think I said that. What I said was I think that Belgravia agreed that it would confer and consult with PolyNatura regarding the renewal of the water lease.

It doesn't mean that Belgravia had to go send in an application. It did mean they needed to stand ready -- not at any time, six months prior to expiration of the lease, to confer and consult. And

Page 119

P. HONG

if you look at the board of directors of Belgravia, you'll see people who have deep connections to New Mexico.  And so therefore are able to confer and consult.

But it didn't require any promises of results or similar.  So I really honestly do not see how standing ready to confer and consult is at odds with PolyNatura's agreement that's set out elsewhere here.

Q   Do you know what efforts PolyNatura undertook to renew the water lease before October 5, 2019?

A   I can't recall specifics, but I do know that we hired one of the preeminent law firms, probably up there alongside yours, to work on renewal of the lease.

You had shown me an email earlier today that confirmed the same.  It showed that a member of the Brownstein Hyatt firm, a partner at the Brownstein Hyatt firm wrote to the general counsel of the New Mexico State Land Office to pursue

Page 120

P. HONG

and make sure that we had access to the water.

So I can't remember everything that we did, but I mean, even what you showed me -- just part of the efforts used to obtain that which were ultimately successful.  An easement was granted. That easement, the State of New Mexico itself set the date of that easement to match the expiration date of the lease to ensure that there would be no gap in rights to use the water.  So that there was an unbroken gap in time of the rights to use the water even if they weren't actually used.  It was intended to make clear from the state that there were no lapses.

Q   And what was -- that easement was nunc pro tunc; correct?

A   I don't know what that word means.

Q   The easement --

MR. LITVACK:  Retroactive --

//

Page 121

31 (Pages 118 - 121)